## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VINCENT HARVEY and** | : | |
| **RICHARD HAWKINS,** | : | |
| **Plaintiffs** | : | |
| | : | **No. 3:18-cv-939** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **CO1 D. CLINE,** *et al.*, | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This matter is before the Court pursuant to Defendants' motion for reconsideration (Doc. No. 83) of the Court's February 26, 2021 Memorandum and Order (Doc. Nos. 81, 82) granting in part and denying in part Defendants' first motion for summary judgment (Doc. No. 75), as well as Defendants' second motion for summary judgment (Doc. No. 85). *Pro se* Plaintiffs Vincent Harvey ("Harvey") and Richard Hawkins ("Hawkins") have not filed responses to the motions and have not requested extensions of time to do so. Accordingly, because the time for responding has expired, Defendants' motions are ripe for disposition.

## I.    BACKGROUND

On May 4, 2018, Plaintiffs, who were both incarcerated at the State Correctional Institution Benner Township ("SCI Benner Township") at that time,[1] initiated the above-captioned case by filing a complaint pursuant to 42 U.S.C. § 1983

---

[1] Plaintiff Harvey was released from DOC custody in 2019.  (Doc. No. 55.)

against Defendants CO1 D. Cline ("Cline"), Tammy Ferguson ("Ferguson"), the Pennsylvania Department of Corrections ("DOC"), and inmate Michael Peterson ("Peterson").  (Doc. No. 1.)  Plaintiffs' claims stem from two (2) separate incidents that occurred on the same day with inmate Peterson.  (*Id.*)  Plaintiffs allege various constitutional and state law violations arising from these incidents.  (*Id.*)  They seek damages as well as injunctive relief.[2]  (*Id.*)

Defendants Cline, Ferguson, and the DOC filed an answer on August 30, 2018.  (Doc. No. 18.)  Inmate Peterson was dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure on April 30, 2019.  (Doc. No. 33.)  Subsequently, counsel appeared on behalf of Plaintiffs.  (Doc. No. 57.)  The Court then granted the parties extensions of time to complete fact discovery and file dispositive motions.  (Doc. Nos. 60, 62, 68.)  Counsel subsequently moved to withdraw his representation of Plaintiffs (Doc. No. 73), which the Court granted (Doc. No. 74).  Defendants filed their motion for summary judgment on November 23, 2020, arguing, *inter alia*, that Plaintiff Hawkins had failed to exhaust his administrative remedies prior to filing suit.  (Doc. Nos. 75, 76, 77.)  In its December 7, 2020 Order, the Court informed the parties that, pursuant to *Paladino v. Newsome*,

---

[2] Plaintiff Harvey's release from custody moots his claims for injunctive relief.  *See Robinson v. Cameron*, 814 F. App'x 724 (3d Cir. 2020).

885 F.3d 203 (3d Cir. 2018), it would consider the exhaustion issue in the context of summary judgment, and by doing so, would consider matters outside the pleadings in its role as factfinder. (Doc. No. 78.) Accordingly, the Court directed Plaintiffs to respond to Defendants' motion within twenty-one (21) days. (*Id.*) On December 28, 2020, Plaintiffs moved for a forty-five (45) day extension to respond. (Doc. No. 79.) The Court granted their motion in an Order entered December 30, 2020. (Doc. No. 80.) Despite receiving an extension of time, Plaintiffs did not file a response.

In a Memorandum and Order dated February 26, 2021, the Court granted in part and denied in part Defendants' motion for summary judgment. (Doc. Nos. 81, 82.) The Court granted the motion with respect to Plaintiffs' § 1983 claims against Defendants Ferguson and the DOC, Plaintiff Hawkins' § 1983 claims against Defendant Cline, Plaintiffs' Fourteenth Amendment due process claims concerning the loss of property, and Plaintiff's § 1983 civil conspiracy claims against Defendants. (Doc. No. 82.) The Court denied the motion as to Plaintiff's Harvey's § 1983 Eighth Amendment claims regarding failure to protect and denial of medical care against Defendant Cline. (*Id.*) Finally, the Court denied the motion without prejudice as to Plaintiffs' First Amendment retaliation claims and state law claims against Defendants. (*Id.*) The Court noted that Defendants could file a second

3

motion for summary judgment regarding the First Amendment and state law claims within thirty (30) days.  (*Id.*)

Defendants filed their motion for reconsideration on March 12, 2021, seeking reconsideration of the Court's denial of summary judgment as to Plaintiff Harvey's Eighth Amendment claims against Defendant Cline.  (Doc. Nos. 83, 84.)  They filed their second motion for summary judgment on March 29, 2021.  (Doc. Nos. 85, 86, 87.)  Defendants argue, *inter alia*, that Plaintiffs failed to exhaust their administrative remedies.  (Doc. No. 87.)   In its March 29, 2021 Order, the Court informed the parties that, pursuant to *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018), it would consider the exhaustion issue in the context of summary judgment, and by doing so, would consider matters outside the pleadings in its role as factfinder.  (Doc. No. 88.)  Accordingly, the Court directed Plaintiffs to respond to Defendants' motion within twenty-one (21) days.  (*Id.*)   Despite this directive, Plaintiffs have not filed a response.

## II.   STANDARDS OF REVIEW

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

4

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits,

depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue

to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## B.    Motion for Reconsideration

As noted *supra*, the Court's February 26, 2021 Memorandum and Order did not dispose of all of Plaintiffs' claims for relief. Accordingly, Defendants seek reconsideration of an interlocutory ruling, not a final judgment or order. While reconsideration of a final judgment or order may be considered under Federal Rules of Civil Procedure 59(e) or 60(b), "the appropriate Rule under which to file motions for reconsideration of an interlocutory order is Rule 54(b)." *Cezair v. JP Morgan Chase Bank N.A.*, No. 13-2928, 2014 WL 4955535, at *1 (D. Md. Sept. 30, 2014); *see also Qazizadeh v. Pinnacle Health Sys.*, 241 F. Supp. 3d 292, 298 (M.D. Pa. 2016) (noting that "motions for reconsideration of interlocutory orders—whether

denials of summary judgment, grants of partial summary judgment, or any other non-final orders—are motions under Federal Rule of Civil Procedure 54(b)").  Rule 54(b) provides:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

A motion for reconsideration with respect to a final order or judgment must rely on one (1) of three (3) grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence . . . or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).  The purpose of such a motion is "to correct manifest errors of law or fact or to present newly discovered evidence." *Bootay v. KBR, Inc.*, 437 F. App'x 140, 146-47 (3d Cir. 2011) (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).  To be successful, the movant must demonstrate a "definite and firm conviction that a mistake has been committed," or that the court overlooked arguments that were previously made. *United States v. Jasin*, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003).  "It may not be used as a means to

reargue unsuccessful theories or argue new facts or issues that were not presented to the court in the context of the matter previously decided." *Gray v. Wakefield*, No. 3:09-cv-979, 2014 WL 2526619, at *2 (M.D. Pa. June 4, 2014); *see also Database Am., Inc. v. Bellsouth Adver. & Publ'g Corp.*, 825 F. Supp. 1216, 1220 (D.N.J. 1993) ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'").

"While the standards articulated [above] are not binding in an analysis of Rule 54(b) motions, courts frequently look to these standards for guidance in considering such motions." *Ampro Computers, Inc. v. LXE, LLC*, No. 13-1937, 2016 WL 3703129, at *2 (D. Del. July 8, 2016) (quoting *Cezair*, 2014 WL 4955535, at *1). Reconsideration of interlocutory orders, however, "may be had even if the movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issued the underlying order, or the 'need to correct a clear error of law or fact to prevent manifest injustice.'" *Qazizadeh*, 214 F. Supp. 3d at 298 (quoting *Quinteros*, 176 F.3d at 677). "[T]he court may permit reconsideration whenever 'consonant with justice to do so.'" *Id.* (quoting *St. Mary's Area Water Auth. v. St. Paul Fire and Marine Ins. Co.*, 472 F.

Supp. 2d 630, 632 (M.D. Pa. 2007)).  Courts, however, should exercise this authority with a "light hand."  *Foster v. Westchester Fire Ins. Co.*, No. 09-1459, 2012 WL 2402895, at \*4 (W.D. Pa. June 26, 2012).  The United States Court of Appeals for the Third Circuit has explained that while "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance . . . as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice."  *In re Pharmacy Benefit Managers*, 582 F.3d 432, 439 (3d Cir. 2009) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

10

## III.   STATEMENT OF MATERIAL FACTS[3]

### A.   Facts Regarding Administrative Exhaustion

The DOC has established a grievance review system "to provide prisoners in its custody with a regular procedure to resolve problems or other issues arising during the course of their confinement." (Doc. No. 86 ¶ 1.)  The grievance system policy is set forth in DC-ADM 804.  (*Id.*)  Under DC-ADM 804, "any inmate personally affected by a Department or institutional action or policy or by the action of a Department employee may file a grievance." (*Id.* ¶ 2.)  Informal resolution prior

---

[3] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements. *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.*  Unless otherwise noted, the background herein is derived from Defendants' second Rule 56.1 statement of material facts. (Doc. No. 86.)

Plaintiffs did not file a response to Defendants' statement of facts in compliance with M.D. Pa. L.R. 56.1. However, they have filed a verified complaint, which may be treated as an affidavit in opposition to summary judgment. *See Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003) (noting that "the complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)"); *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion); *see also Boomer v. Lewis*, No. 06-850, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").  However, this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." *Hammonds v. Collins*, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing *Brooks v. Am. Broad. Co.*, 999 F.2d 167, 172 (6th Cir. 1993)).  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendants to be undisputed. *See* M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2).

11

to submitting a grievance is encouraged. (*Id.*) A grievance must be submitted to the Facility Grievance Coordinator, "using the grievance form that is available on all housing units or blocks." (*Id.*) All inmates may file grievances, and all inmates are provided with a copy of the grievance policy "when coming into one of the Department's diagnostic and classification centers and are provided notice of any revisions to the policy and procedures manual." (*Id.* ¶¶ 3-4.) Moreover, "a copy of the grievance system policy and procedures manual is available on all housing blocks and in the institutional library for inmates to review or request to obtain copies." (*Id.* ¶ 4.)

DC-ADM 804 sets forth three (3) levels of grievance review: "(1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the SOIGA for final review." (*Id.* ¶ 5.) When submitting a grievance, the inmate must include a statement of relevant facts, as well as the date, time, and location of the events. (*Id.* ¶ 7.) The inmate must also identify the individuals involved, state the claims he wishes to raise, and include a request for the relief sought. (*Id.*) "The inmate is required to include a request for the specific relief sought—such as compensation—in the initial grievance." (*Id.*) A grievance for initial review must be submitted to the Facility Grievance Coordinator "within 15 working days after the event upon which the claim is based." (*Id.* ¶ 9.) The Facility

Grievance Coordinator assigns a tracking number to every grievance upon receipt and enters it into the Automated Inmate Grievance Tracking System. (*Id.* ¶ 10.)

An inmate may appeal an Initial Review Response or grievance rejection to the Facility Manager (Superintendent) within fifteen (15) working days from the date of the response or rejection. (*Id.* ¶ 11.) The appeal "must contain the reasons for the appeal." (*Id.* ¶ 12.) "Only an issue that was raised for Initial Review, determination of frivolousness, rejection and/or placement on grievance restriction may be appealed." (*Id.*) The Facility Manager provides a written response which "may, among other things: Uphold the Initial Review Response, Uphold Inmate, Dismiss, Uphold in Part/Deny in Part, or Remand." (*Id.* ¶ 13.)

An inmate may appeal the Facility Manager's response within fifteen (15) working days to the "Secretary's Office of Inmate Grievances and Appeals [('SOIGA')]." (*Id.* ¶ 14.) "Only issues raised in both the original grievance and the appeal to the Facility Manager may be appealed to" SOIGA. (*Id.* ¶ 15.) Along with the appeal, the inmate must include copies of the Initial Grievance, Initial Review Response, Inmate Appeal to the Facility Manager, and the Facility Manager's response. (*Id.* ¶ 16.) SOIGA "may, among other things: Uphold Response, Uphold Inmate, Dismiss, Uphold in Part/Deny in Part, or Remand." (*Id.* ¶ 17.) When an appeal is remanded by SOIGA, "notification is provided to both the inmate and

13

facility, and the facility provides a revised response to the inmate." (*Id.* ¶ 18.)  If an inmate is dissatisfied with the revised response, he "may appeal the revised response to final review again within fifteen (15) working days of the date of the revised response." (*Id.* ¶ 19.)

Keri Moore, a grievance officer for SOIGA, checked SOIGA's files "for grievances filed by the Plaintiffs against Officer Cline for retaliation." (*Id.* ¶ 20.) Plaintiffs did not file a grievance "against Officer Cline for retaliation for filing grievances or for seeking medical treatment, or for retaliation at all." (*Id.* ¶ 21.) Moreover, Plaintiff Harvey did not exhaust a claim for damages against Defendant Cline. (*Id.* ¶ 62.)

### B.  Facts Related to Defendant Cline

Defendant Cline had no knowledge at any time that inmate Peterson "had a propensity for violence against other inmates or that he was involved in gang activity." (*Id.* ¶ 22.)  Defendant Cline also had no knowledge of inmate Peterson "assaulting inmates on the E-Block or having a history of doing so." (*Id.* ¶ 23.)  At no time did Plaintiffs inform Defendant Cline "of a risk of harm to either of them posed by" inmate Peterson.  (*Id.* ¶ 24.)

E-Block "is a general population block and inmates are permitted to leave their cells for various reasons, and interact freely." (*Id.* ¶ 25.)  Defendant Cline "did

not view [inmate] Peterson walking aggressively towards [Plaintiff] Harvey's cell."
(*Id.* ¶ 26.)  Defendant Cline had no notice of any plans by inmate Peterson to assault
Plaintiffs.  (*Id.* ¶ 27.)  On the day in question, when Defendant Cline saw inmate
Peterson outside of Plaintiff Harvey's cell, Defendant Cline "directed him to return
to his cell and ordered [Plaintiff] Harvey to close his cell door."  (*Id.* ¶ 28.)
Defendant Cline "had not opened the cell door for" inmate Peterson.  (*Id.* ¶ 29.)
Neither Plaintiff informed Defendant Cline of an altercation, and Defendant Cline
did not seek any blood.  (*Id.* ¶ 30.)  Plaintiff Harvey did not tell Defendant Cline
"that he was attacked, nor did he request to go to medical."  (*Id.* ¶ 31.)

Defendant Cline "did not mishandle or fail to return Plaintiffs' property, nor
did [he] delay call outs or cause the Plaintiffs to miss sign up times for kiosk, phone
and haircuts, at all."  (*Id.* ¶ 32.)  Defendant Cline "did not retaliate against the
Plaintiffs for any reason, whatsoever."  (*Id.* ¶ 33.)  Plaintiff Harvey did not interact
with Defendant Cline after the incident, and Defendant Cline was no longer an
officer in charge of Plaintiff Harvey "because they were no longer on the same
block."  (*Id.* ¶ 34.)

Prior to the incident, Defendant Cline never charged Plaintiff Harvey with any
misconducts, and Plaintiff Harvey never filed any grievances about Defendant Cline.
(*Id.* ¶ 35.)  Plaintiff Harvey and Defendant Cline "had an amicable relationship and

there was no bad blood between the two." (*Id.* ¶ 36.) Plaintiff Harvey testified that "if he wanted a shower, [Defendant Cline] would allow him to shower, and if he wanted to use the phone, [Defendant] Cline would let him use the phone." (*Id.* ¶ 37.) Plaintiff Hawkins "did not sue [Defendant] Cline on grounds of retaliation." (*Id.* ¶ 38.) Plaintiff Hawkins "had a respectful relationship with [Defendant] Cline over the years." (*Id.* ¶ 40.) Defendant Cline never charged Plaintiff Hawkins with any misconducts, and Plaintiff Hawkins never filed any grievances about Defendant Cline. (*Id.* ¶ 41.) "[Defendant] Cline would ask [Plaintiff] Hawkins if he wanted to use the phone if [Plaintiff] Hawkins signed up for phone." (*Id.* ¶ 42.)

Plaintiff Harvey "never had [] a personal relationship with" inmate Peterson. (*Id.* ¶ 45.) He "stays away from people he does not know and only deals 'with the people that [he] know[s] from the outside or family members.'" (*Id.* ¶ 46.) He did not know inmate Peterson previously. (*Id.* ¶ 47.) Inmate Peterson was "not one that he 'would even say what's up to or hi' and that Peterson 'just was there as another 1 of 125 inmates that was there.'" (*Id.* ¶ 48.) Plaintiff Harvey testified that "these interactions (or lack thereof never changed and that [inmate] Peterson remained just another random person on the block, until the day in question." (*Id.* ¶ 49.) He noted that inmate Peterson "had never made any threats to him, and that 'the date this happened was all—it was all just random.'" (*Id.* ¶ 50.) "[I]t was a normal day

16

leading to the incident." (*Id.* ¶ 51.)  Inmate Peterson was not in a rival gang. (*Id.* ¶ 52.)

Plaintiff Harvey attacked inmate Peterson first by charging him and hitting him with a fan, "destroying the fan, at the 'moment that [Peterson] turn[ed] his head to look towards the door.'" (*Id.* ¶ 53.)  Plaintiff Hawkins did not see inmate Peterson approaching Plaintiff Harvey's cell and did not witness the incident or Plaintiff Harvey allegedly being stabbed.  (*Id.* ¶ 54.)  Plaintiff Harvey had "no knowledge that [Defendant] Cline knew the attack would occur." (*Id.* ¶ 55.)  His "cell door may have been left open or opened accidentally." (*Id.* ¶ 56.)

"Plaintiffs are later seen on video, both fully ambulatory and without obvious injury, viciously and maliciously attacking Inmate Peterson in a two on one fight." (*Id.* ¶ 57.)  Plaintiff Harvey "received medical attention for any and all injuries on the very same day, and within hours, of both alleged incidents." (*Id.* ¶ 58.)  He "did not need stitches for his wounds, and he was given gauze, and [] his wounds healed without issue." (*Id.* ¶ 59.)  Plaintiff Harvey "did not ask [Defendant] Cline to go to medical." (*Id.* ¶ 60.)  No one in the medical department "inquired as to why is injuries were not looked at earlier." (*Id.* ¶ 61.)

## IV.   DISCUSSION

### A.   Claims Pursuant to 42 U.S.C. § 1983

#### 1.   Administrative Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). Section 1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth*, 532 U.S. at 742 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"). Moreover, while Plaintiff Harvey was released from prison after filing the above-captioned case, he is still bound by the exhaustion

18

requirement because he has raised claims concerning events that occurred prior to his release.[4]  *See Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir. 2002).

The Third Circuit has further provided that there is no futility exception to Section 1997e's exhaustion requirement.  *See Nyhuis v. Reno*, 204 F.3d 65, 75-76 (3d Cir. 2000).  Courts have typically required across-the-board exhaustion by inmates seeking to pursue claims in federal court.  *See id.*  Additionally, courts have interpreted this exhaustion requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding with a claim in federal court.  *See Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004); *see also Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court").  Courts have also concluded that inmates who fail to complete the prison

---

[4] The Court recognizes that the Third Circuit recently concluded that the PLRA's exhaustion requirement did not apply to a situation where a plaintiff had been released from prison during the pendency of his lawsuit and, after release, filed a third and fourth amended complaint.  *See Garrett v. Wexford Health*, 938 F.3d 69, 84 (3d Cir. 2019).  The *Garrett* court noted that, in that instance, the plaintiff's "status as a non-prisoner at the time he filed the [third amended complaint was] determinative of the Medical Defendants' administrative exhaustion defense."  *See id.* at 87.  In the instant case, however, Plaintiff Harvey is proceeding on the complaint he filed while still incarcerated.  The Court concludes that *Garrett* is inapposite to the above-captioned case and, therefore, does not apply to excuse Plaintiff Harvey from satisfying the PLRA's exhaustion requirement.

grievance process in a full and timely manner are barred from subsequently litigating claims in federal court. *See, e.g., Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008).

This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement. *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000). However, courts also recognize a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." *See Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," *see Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." *See Warman*, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused. An inmate, therefore, may not excuse a failure to comply with these grievance procedures in a timely manner by

simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. *See Harris*, 149 F. App'x at 59. Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him. *See Warman*, 49 F. App'x at 368. Consequently, an inmate's confusion regarding these grievances procedures does not, alone, excuse a failure to exhaust. *See Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003); *see also Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated *pro se* petitioner, generally does not excuse prompt filing.'" (citations omitted)).

Recently, the Supreme Court considered what renders administrative remedies unavailable to an inmate such that a failure to exhaust may be excused. *See Ross v. Blake*, 136 S. Ct. 1850 (2016). The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *See id.* at 1859. First, an administrative procedure is not available "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *See id.* Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use." *See id.* Finally, a procedure is unavailable when "prison administrators

thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation." *See id.* at 1860. However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). The Third Circuit recently established that:

> to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff, an inmate must show (1) that the misrepresentation is one which a reasonable inmate would be entitled to rely on and sufficiently misleading to interfere with a reasonable inmate's use of the grievance process, and (2) that the inmate was actually misled by the misrepresentation.

*Hardy v. Shaikh*, 959 F.3d 578, 588 (3d Cir. 2020).

### a.     Retaliation Claims

Defendants maintain that they are entitled to summary judgment with respect to any retaliation claims raised by Plaintiffs because Plaintiffs failed to exhaust their administrative remedies as to such claims. (Doc. No. 87 at 8-11.) In support of their argument, Defendants have provided a declaration from Keri Moore, a grievance officer with SOIGA. (Doc. No. 86-1.) She avers that she checked SOIGA's files "for grievances filed by the Plaintiffs against Officer Cline for retaliation." (*Id.* ¶ 23.) Neither Plaintiff Harvey nor Plaintiff Hawkins "filed a grievance against

Officer Cline for retaliation for filing grievances or for seeking medical treatment, or for retaliation at all." (*Id.* ¶ 24.)

Plaintiffs have not responded to Defendants' motion for summary judgment. In their verified complaint, however, they state that they "fully and properly exhausted their available administrative remedies prior to bringing the instant action." (Doc. No. 1 ¶ 57.) Plaintiffs' conclusory allegation, without any accompanying evidence, such as any grievances they attempted to submit regarding claims of retaliation, does not create a genuine issue of material fact with respect to exhaustion. *See Maclary v. Carroll*, 142 F. App'x 618, 620 (3d Cir. 2005) (concluding that inmate-plaintiff's allegation that he filed unanswered and unprocessed grievances did not create a genuine issue of material fact because he failed to offer any support for his bare assertions); *Keys v. Caroll*, No. 10-cv-1570, 2012 WL 4472020, at *8 (M.D. Pa. Sept. 26, 2012) (concluding that inmate-plaintiff's reliance on the complaint, deposition testimony, and affidavit that he exhausted his administrative remedies was not sufficient to withstand summary judgment because the allegations were conclusory and made without evidentiary support). Plaintiffs, therefore, have not refuted the defense that they failed to properly exhaust their retaliation claims. Accordingly, because the PLRA requires full and proper exhaustion prior to the initiation of Plaintiffs' retaliation claims in

federal court, and this Court cannot excuse compliance with those requirements, Defendants' second motion for summary judgment will be granted on the basis that Plaintiffs failed to properly exhaust their administrative remedies as to any retaliation claims asserted against Defendants.

### b.     Plaintiff Harvey's Damages Claims

In its February 26, 2021 Memorandum, the Court noted that Plaintiff Harvey did file a grievance regarding the incident on November 7, 2017, with inmate Peterson.  (Doc. No. 81 at 22.)  In their first motion for summary judgment, Defendants did not argue that Plaintiff Harvey had failed to exhaust his administrative remedies.  In their second motion for summary judgment, Defendants now assert that Plaintiff Harvey did not exhaust a claim for damages and, therefore, is not entitled to claim damages in connection with the above-captioned action. (Doc. No. 87 at 23-25.)

Plaintiff Harvey's release from incarceration moots his claims for injunctive and declaratory relief.  *See Abdul-Akbar v. Watson*, 4 F.3d 195, 206-07 (3d Cir. 1993).  Thus, only his claims for damages remain.  As noted *supra*, when an inmate files a grievance, he is "required to include a request for the specific relief sought— such as compensation—in the initial grievance."  (Doc. No. 86 ¶ 7.)  With respect to proper exhaustion under the PLRA, "it is the prison's requirements, [] not the [Act],

24

that define the boundaries of proper exhaustion." *Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)). A review of Plaintiff Harvey's grievance regarding the November 7, 2017 incident indicates that he did not seek monetary damages during the grievance process. (Doc. No. 86-5 at 45-51.) Thus, because Defendant Harvey failed to request monetary damages, he did not properly exhaust his claim for such. *See Johnson v. Wireman*, 809 F. App'x 97, 99 (3d Cir. 2020); *Murray v. Wetzel*, No. 1:17-cv-1637, 2021 WL 1173001, at *7 (M.D. Pa. Mar. 29, 2021). Defendants, therefore, are entitled to summary judgment with respect to Plaintiff Harvey's claim for damages.

## 2.   Eighth Amendment Claims

As noted *supra*, the Court previously denied Defendants' first motion for summary judgment with respect to Plaintiff Harvey's Eighth Amendment claims against Defendant Cline. (Doc. Nos. 81, 82.) Defendants move for reconsideration of that decision, arguing that the record could not lead a reasonable fact-finder to conclude that Defendant Cline failed to protect Plaintiff Harvey from inmate Peterson's attack and failed to provide him medical care. (Doc. No. 84.)

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. There are several types of Eighth Amendment claims, including claims alleging: denial of, or inadequate access to, medical care; exposure

25

to adverse conditions of confinement; and the use of excessive force by prison guards.   An Eighth Amendment claim includes both objective and subjective components.  *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. *See id.*  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind."  *See id.*

### a.   Failure to Protect

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another equates to constitutional liability for the officials responsible for that inmate's safety.  *Id.* at 833-34.  Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety."  *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  *Id.*; *see also Hamilton v. Leavy*, 117 F.3d 742,

26

746 (3d Cir. 1997).  Actual knowledge may be proven circumstantially in situations

where the general danger was obvious.  *Farmer*, 511 U.S. at 842.  For example, if

the prisoner

> presents evidence showing that a substantial risk of inmate attacks was
> "longstanding, pervasive, well-documented, or expressly noted by
> prison officials in the past, and the circumstances suggest that the
> defendant-official being sued had been exposed to information
> concerning the risk and thus 'must have known' about it, then such
> evidence could be sufficient to permit a trier of fact to find that the
> defendant-official had actual knowledge of the risk."

*Id.* at 842-43.  However, "a defendant can rebut a *prima facie* demonstration of

deliberate indifference either by establishing that he did not have the requisite level

of knowledge or awareness of the risk, or that, although he did know of the risk, he

took reasonable steps to prevent the harm from occurring."  *Beers-Capitol*, 245 F.3d

at 133.

The Court initially denied summary judgment to Defendants, asserting that

the "averments in Plaintiffs' verified complaint create a genuine issue of material

fact as to whether Defendant Cline was aware that inmate Peterson posed a risk to

Plaintiff Harvey's safety and chose to ignore that risk."  (Doc. No. 81 at 26.)  In the

verified complaint, Plaintiffs alleged that Defendant Cline was aware of inmate

Peterson's "gang membership and assaultive behavior," as well as his "victimization

of vulnerable inmates on E-Block and of the ongoing conflict created by Defendant

27

Peterson upon Plaintiff Harvey." (Doc. No. 1 ¶¶ 18-19.) They asserted that Defendant Cline watched inmate Peterson "walk across the tier to Plaintiff Harvey's cell, which is an unauthorized area for Defendant Peterson," and did not stop him from doing so. (*Id.* ¶¶ 20-21.) Plaintiffs averred that Defendant Cline opened Plaintiff Harvey's cell door and observed inmate Peterson "enter into Plaintiff Harvey's cell in a rushed, deliberate and aggressive manner. (*Id.* ¶¶ 22-23.) Plaintiffs asserted that Defendant Cline was aware that inmate Peterson often extorted other inmates "through intimidation [and] threats of force and physical stabbings." (*Id.* ¶ 38.)

Defendants argue that these findings "are directly contradicted by the record developed in discovery." (Doc. No. 84 at 12.) Upon review of the record, the Court agrees. Plaintiffs' deposition testimony directly conflicts with the statements made in their complaint. In his deposition, Plaintiff Harvey testified that he had no prior history with inmate Peterson, that inmate Peterson had never threatened him before the incident, and that "it was all just random." (Doc. No. 86-3 at 15-16.) Plaintiff Harvey testified that "come to find out, this is [inmate Peterson's] history of what he does. He's been in multiple prisons doing the same thing." (*Id.* at 16.) He described the day leading up to the incident as a "normal day." (*Id.*) Plaintiff Harvey surmised that Defendant Cline opened the cell door because only officers can open

doors, but he then admitted that sometimes cell doors are opened accidentally and that it was possible his cell was open because he was talking to other inmates. (*Id.* at 64-66.) Plaintiff Hawkins testified that he and inmate Peterson were not in rival gangs. (Doc. No. 86-4 at 12.) He testified further that he had a friendly relationship with inmate Peterson and did not witness the incident between inmate Peterson and Plaintiff Harvey. (*Id.* at 13-14.) Plaintiffs did not testify that inmate Peterson was known for being violent or assaulting others on their specific housing block. Moreover, Plaintiffs did not testify that Defendant Cline saw inmate Peterson walking aggressively towards Plaintiff Harvey's cell or that Defendant Cline knew or should have known that an assault would occur. Furthermore, Defendant Cline avers that at no time did he "have knowledge that [inmate] Peterson had a propensity for violence against other inmates or that he was involved in gang activity." (Doc. No. 86-2 ¶ 3.) He had no knowledge of inmate Peterson "assaulting inmates on the E-Block or having a history of doing so," and Plaintiffs never "inform[ed him] of a risk of harm to either of them posed" by inmate Peterson. (*Id.* ¶¶ 4-5.) Defendant Cline did not see inmate Peterson walking to Plaintiff Harvey's cell and did not open the cell door for him. (*Id.* ¶¶ 7, 10.)

While a sworn complaint can be treated as an affidavit on summary judgment, *see Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985), the averments contained in

29

Plaintiffs' complaint are directly contradicted by their deposition testimony. In light of Plaintiffs' deposition testimony, asserting that they had no prior history with inmate Peterson, that they were not aware of any propensity for violence exhibited by inmate Peterson, and that they did not see Defendant Cline open Plaintiff Harvey's cell door, the Court considers the allegations set forth in Plaintiffs' complaint "to effectively be a sham affidavit, and conclude[s] that no reasonable jury could afford [them] evidentiary weight." *Coit v. Garman*, 812 F. App'x 83, 87 (3d Cir. 2020) (citations omitted).

In any event, even if Defendant Cline had been aware that inmate Peterson had a history of violence, the Third Circuit has held that the risk that "an inmate with a history of violence might attack another inmate for an unknown reason" is too speculative to maintain a failure to protect claim against prison officials. *Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). The Third Circuit recently reiterated this, affirming a grant of summary judgment to prison officials even where the inmate had reported a prior attack to an unnamed guard. *See Zuniga v. Chamberlain*, 821 F. App'x 152, 157 n.8 (3d Cir. 2020). In the instant case, the record before the Court establishes that "the assault [by inmate Peterson] was random, and was not the product of 'longstanding, pervasive, well-documented, or previously noted tensions between'"

Plaintiff Harvey and inmate Peterson. *See Bozochovic v. Verano*, No. 1:17-cv-1439, 2019 WL 929089, at *3 (M.D. Pa. Feb. 26, 2019) (quoting *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014)).

In sum, the Court agrees with Defendants that the record would not permit a reasonable factfinder to conclude that Defendant Cline knew that inmate Peterson posed a risk of harm to Plaintiff and deliberately ignored that risk. The Court, therefore, will grant Defendants' motion for reconsideration, vacate the portion of its February 26, 2021 Memorandum and Order denying summary judgment as to Plaintiff Harvey's failure to protect claim, and grant summary judgment to Defendants.

### b.    Denial of Medical Care

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197.  The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.  Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol*, 256 F.3d at 133 (citing *Farmer*, 511 U.S. at 842)).  Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

In the complaint, Plaintiff Harvey alleges that Defendant Cline violated his Eighth Amendment rights by delaying access to medical care.  Plaintiff Harvey avers that he asked for medical attention after being assaulted by inmate Peterson, and that

Defendant Cline did nothing despite observing Plaintiff Harvey's "bloody cell and stab wounds." (Doc. No. 1 ¶¶ 75-78.)  He alleges that the delay in receiving medical treatment caused him "to sustain further injury, pain, distress, anguish, and permanent scarring on his face, arm, and leg." (*Id.* ¶ 54.)  According to Plaintiff, when he was taken to the medical department following the second incident, medical personnel asked why his wounds were not called to their attention in a more timely manner.  (*Id.* ¶ 49.)

Defendants maintain that the record does not support a conclusion that a reasonable juror could find that Defendant Cline was deliberately indifferent to Plaintiff Harvey's medical needs.  (Doc. No. 84 at 18-19.)  Defendant Cline avers that Plaintiff Harvey "did not tell [him] that he was attacked, nor did he request to go to medical." (Doc. No. 86-2 ¶ 12.)  He also states that he did not "see any blood." (*Id.* ¶ 11.)  During his deposition, Plaintiff Harvey testified that he was not sure if there was blood visible on his clothes and that any blood on his face was likely "consumed" by his beard.  (Doc. No. 86-3 at 36-37.)  He did testify that there were droplets and spatter on the cell floor and a cabinet.  (*Id.* at 37-38.)  At no time did Plaintiff Harvey ask Defendant Cline for permission to go to the medical department. Moreover, he did not testify that anyone in medical asked why his injuries were not seen to earlier.  When asked, Plaintiff Harvey did not mention that he had brought

suit against Defendant Cline for any denial of medical care. (*Id.* at 69-70.) Finally, the video Defendants submitted in support of their first motion for summary judgment (Doc. No. 76-6) clearly shows Plaintiff Harvey, ambulatory and without any obvious injuries, fully participating in the attack on inmate Peterson with Plaintiff Hawkins.

Although Plaintiff Harvey averred in his complaint that Defendant Cline denied him medical care when he requested it, at no time did Plaintiff testify to this during his deposition. Moreover, Plaintiff Harvey has failed to respond to Defendants' motion for reconsideration. In light of the "glaring omission of [Plaintiff Harvey's] key complaint allegation[s] from . . . his deposition testimony," the Court considers such allegations "to effectively be a sham affidavit, and conclude[s] that no reasonable jury could afford [them] evidentiary weight." *Coit*, 812 F. App'x at 87. Given the record before the Court, no reasonable factfinder could conclude that Defendant Cline "consciously disregarded a serious risk to [Plaintiff Harvey's] health or prevented him from receiving necessary medical treatment." *See Blanchard v. Reigle*, 439 F. App'x 102, 104 (3d Cir. 2011) (concluding the same regarding the inmate-plaintiff's claims that officers delayed his access to medical care because the inmate "was able to ambulate on the day of the incident and did not have any obvious or visible injuries"); *see also Williams v.*

*Wetzel*, No. 1:17-cv-79, 2020 WL 583983, at *14 (M.D. Pa. Feb. 6, 2020) (citing *Blanchard* to conclude the same), *aff'd*, 827 F. App'x 158 (3d Cir. 2020). The Court, therefore, will grant Defendants' motion for reconsideration, vacate its previous denial of summary judgment, and grant summary judgment to Defendants with respect to Plaintiff Harvey's Eighth Amendment denial of medical care claim against Defendant Cline.

### 3.    First Amendment Retaliation Claims

As noted *supra*, Plaintiffs failed to exhaust their administrative remedies with respect to any retaliation claims. Even if they had, Defendants assert that Plaintiffs cannot maintain a claim for retaliation. (Doc. No. 87 at 11-16.) To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements. First, a plaintiff must prove that he was engaged in a constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)). Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating

factor' in the decision to discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials

can make this showing, it defeats the retaliation claim.  *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

In their complaint, Plaintiffs vaguely aver that they were "engaging in the constitutionally protected conduct of seeking medical treatment after being attacked and stabbed by [inmate] Peterson, by engaging in the grievance process and seeking access to the courts for remedies at law."  (Doc. No. 1 ¶ 93.)  They allege that "Defendant Cline and named Defendants and privities did engage in adverse actions against [them] . . . including loss, mishandling and not returning Plaintiff[s'] personal property, delaying call outs and missing sign up times for kiosk, phone, and haircuts."  (*Id.* ¶ 94.)  Plaintiffs suggest that these actions "were substantially motivated by the Plaintiffs engaging in the aforementioned constitutionally protected conduct."  (*Id.* ¶ 94.)

As noted *supra*, Plaintiff Hawkins confirmed that he did not file suit against Defendant Cline on grounds of retaliation.  (Doc. No. 86 ¶ 38.)  In any event, the Court agrees with Defendants that Plaintiffs "did not adequately plead a claim for retaliation." (Doc. No. 87 at 13.)  The complaint fails to set forth any facts regarding any protected activity and does not include any information as to when they were denied phone and haircuts, subjected to delayed "call outs," and when their property was mishandled.  Plaintiffs' complaint, as pled, does nothing more than set forth a

threadbare recital of the requirements necessary to establish a retaliation claim. *See, e.g.*, *Lewis v. Mason*, No. 1:19-cv-1504, 2020 WL 1953608, at *4 (M.D. Pa. Apr. 23, 2020); *Nifas v. Serrano*, No. 1:19-cv-1646, 2020 WL 905583, at *4 (M.D. Pa. Feb. 25, 2020); *Alvarez v. Ebbert*, No. 1:18-cv-1964, 2019 WL 2762964, at *9 (M.D. Pa. July 2, 2019).  In any event, the omission of any allegations of retaliation from Plaintiffs' depositions renders their allegation "to effectively be a sham affidavit," and the Court concludes that "no reasonable jury could afford it evidentiary weight." *See Coit*, 812 F. App'x at 87.  The Court, therefore, will grant summary judgment to Defendants as to Plaintiffs' First Amendment retaliation claims.

### B.      State Law Claims

Plaintiffs maintain that Defendants' actions violated their rights under the Pennsylvania Constitution as well as state law. (Doc. No. 1 at 20-36.)  For example, Plaintiffs appear to assert state tort claims for assault and battery, intentional infliction of emotional distress, lost property, and negligence.  (*Id.* at 23, 28.) Defendants first "disagree that such claims are adequately pled such that [they] would have fairly been on notice of these claims as the case proceeded through discovery." (Doc. No. 87 at 16.)  However, in an abundance of caution, the Court has liberally construed Plaintiffs' complaint as raising such claims.

Defendants assert, *inter alia*, that the Court should decline to exercise supplemental jurisdiction over any state law claims raised by Plaintiffs. (*Id.* at 16 n.2.) When a district court has dismissed all claims over which it had original jurisdiction, as is the case in the above-captioned action, the Court may decline to exercise supplemental jurisdiction over the pendent state law claims. *See* 28 U.S.C. § 1367(c)(3). The Court's decision regarding the exercise of supplemental jurisdiction is one that should be based on "the values of judicial economy, convenience, fairness, and comity." *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal claims have been dismissed and only state law claims remain, the balance of these factors indicates that the remaining claims properly belong in state court. *See id.* In the absence of a viable federal claim, and finding nothing to distinguish this matter from the ordinary case, the Court finds that the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See id.* at 350 n.7. Accordingly, the Court will dismiss Plaintiffs' state law claims against Defendants pursuant to 28 U.S.C. § 1367(c)(3).[5]

---

[5] The Court notes that when a district court declines to exercise supplemental jurisdiction over state law claims, the statute of limitations is tolled while the federal suit is pending for a period of thirty (30) days after the suit is dismissed. *See* 28 U.S.C. § 1367(d); *Hedges v. Musco*, 204 F.3d 109, 123-24 (3d Cir. 2000).

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for reconsideration (Doc. No. 83) will be granted, the portion of the Court's February 26, 2021 Memorandum and Order (Doc. Nos. 81, 82) which denied summary judgment as to Plaintiff Harvey's Eighth Amendment claims regarding failure to protect and denial of medical care against Defendant Cline will be vacated, and Defendants will be granted summary judgment as to those claims.  Defendants' second motion for summary judgment (Doc. No. 85) will be granted as to Plaintiffs' retaliation claims and Plaintiff Harvey's claims for damages.  Plaintiffs' state law tort claims against Defendants will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).   An appropriate Order follows.

s/ Sylvia H. Rambo
United States District Judge

Date: April 27, 2021